In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-3954, 09-3961 & 10-1204

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SCOTT LEWIS, VERNON WILLIAMS, and
LAVOYCE BILLINGSLEY,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cr-00007—**Virginia M. Kendall**, *Judge.*

ARGUED DECEMBER 8, 2010—DECIDED APRIL 6, 2011

Before FLAUM and EVANS, *Circuit Judges*, and
MCCUSKEY, *District Judge.*[*]

EVANS, *Circuit Judge.* Scott Lewis, Vernon Williams,
and Lavoyce Billingsley were convicted of conspiracy
to possess cocaine with intent to distribute in violation of
21 U.S.C. § 846, and carrying and possessing a firearm

[*] The Honorable Michael P. McCuskey, United States District
Court for the Central District of Illinois, sitting by designation.

during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). Billingsley was also convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Lewis and Williams were tried together, while Billingsley was tried separately. All three now appeal claiming that the evidence was insufficient to support their convictions under § 924(c). Lewis and Billingsley also claim insufficient evidence for their § 846 convictions. Lewis and Billingsley further appeal various evidentiary rulings, and Lewis and Williams appeal the imposition of the mandatory consecutive sentence under § 924(c).

In what's fast becoming a rather shopworn scenario in this court, Lewis, Williams, and Billingsley, like a host of (apparently) unrelated defendants before them, were convicted of conspiring to distribute cocaine that didn't exist—cocaine they planned to liberate from a fictional stash house guarded by members of an imaginary Mexican cartel. The sting that ensnared the three defendants here was orchestrated by Bureau of Alcohol, Tobacco and Firearms ("ATF") Agent David Gomez in his undercover role as "Loquito." We have seen versions of this sting, which appears a bit tawdry, several times. *See United States v. Blitch*, 622 F.3d 658, 661 (7th Cir. 2010); *United States v. Corson*, 579 F.3d 804, 806-09 (7th Cir. 2009); *United States v. Lewis*,[1] 350 F. App'x 74 (7th Cir. 2009) (nonprecedential order). We use the word "tawdry"

---

[1] The "Lewis" in this case (Demarlon, along with two compatriots, Joaquin Tankey and James King) is, as far as we know, not related to the Scott Lewis in our case.

because the tired sting operation seems to be directed as unsophisticated, and perhaps desperate, defendants who easily snap at the bait put out for them by Agent Gomez.

In our case, the sting was originated after Gomez's confidential informant, Rojo, reported information in December, 2006 concerning an individual known as "Silk," who turned out to be Lewis. Under the direction of the ATF, Rojo placed a recorded call to Lewis to arrange an introductory meeting with Gomez. The following day, Rojo, Gomez, and Lewis met (in a recorded meeting) and Gomez spun Lewis a cover story, namely that he was a disgruntled drug courier working for a Mexican cartel, and that once a month he transports cocaine for the organization. He explained that the day before he is to transport the cocaine, he gets a call telling him to be ready, and the next day he gets a call giving him the location of a secret stash house. He then goes to the guarded stash house, where on any given day he sees between 15 and 20 kilograms of cocaine being prepared. Gomez asked Lewis if he was ready to help knock over the stash house, and Lewis, who unfortunately did not have the benefit of reading our yet-to-be-issued opinions in *Corson*, *Blitch*, and *Lewis*, snapped at the bait. He said he had a crew of three guys ready to go, as well as "some pistols." Gomez, Rojo, and Lewis arranged to meet with the rest of Lewis' crew the following week.

On December 18, 2006, Gomez, Rojo, Lewis, Williams, and an unknown individual identified only as "B"[2] met in a recorded (audio and visual) meeting in Westmont,

---

[2] "B" was not Billingsley.

Illinois. Lewis explained that there was one more member of the crew, but that he couldn't make it to the meeting. Lewis, Williams, and "B" then went on to explain the details of their plan, which was to rush the stash house just as Gomez was leaving, yelling "Freeze, Police!" to surprise the occupants, who they expected to be armed with automatic weapons. They'd then strip the occupants naked, tie them up, steal the drugs and guns, and later sell the drugs. They also discussed various sources for obtaining guns to use in the robbery.

Over the next few weeks, Lewis and "Loquito" a/k/a Gomez participated in multiple recorded phone conversations, during which Lewis reiterated that he and his gang had guns and were ready to go. This culminated in a call on January 3, 2007, from Gomez to Lewis, telling him to have the crew ready to go the next day.

January 4, 2007 was go day. It was also, and interestingly, the day the recordings died. Gomez called Lewis in an unrecorded call and asked that Lewis and his associates meet him in Westmont so they would all be together when the cartel called with the location of the stash house. Lewis replied that the associate who was bringing the guns had been arrested and that he arranged for another person with a gun to fill in.

Lewis, Williams, and Billingsley subsequently met Gomez in the arranged parking lot. Lewis and Williams got out of their car and into Gomez's vehicle, which was outfitted with only one recording unit (although, in keeping with ATF policy, Gomez usually used two devices). Unfortunately, this recording device supposedly

malfunctioned, so the meeting in the car was not re-corded. However, Gomez testified that he asked Lewis who the third guy (who turned out to be Billingsley) was, and Lewis explained it was his associate with the gun. Lewis then went back to the other car and spoke to Billingsley, who got out of the car, retrieved something from the trunk, tucked it into his waistband, and got into Gomez's car.

Once Billingsley was in his car, Gomez explained that they were going to steal about 20 kilograms of cocaine from a stash house. Billingsley confirmed that Lewis had told him about the plan, and he was ready to go. Gomez asked to see the gun, and Billingsley took it from his waistband and showed it to everyone in the car. Gomez then explained that he was going to take the three of them to the storage facility where they were to leave his share of the cocaine after the robbery (Gomez, according to the plan, was to be tied up as if he were one of the "victims"). Lewis, Williams, and Rojo then rode with Gomez to the storage facility, while Billingsley followed in his car.

At the storage facility, Lewis, Williams, and Billingsley were arrested by waiting law enforcement agents. The arrest was videotaped. The tape shows Billingsley, imme-diately prior to his arrest, throwing something under his car. Agents later recovered a loaded Smith & Wesson .40 caliber semi-automatic from under Billingsley's car, and two partially full boxes of .40 caliber ammunition from the trunk. Agents also recovered one pair of black leather gloves and a black doo-rag, or head covering,

from Lewis, one black doo-rag from Billingsley, and two pairs of plastic surgical gloves and a blue stocking-cap from Williams.

Both Lewis and Billingsley made post-arrest statements after being advised of their rights. Lewis admitted that he believed there would be 15 to 20 kilograms of cocaine in the stash house, that he told Gomez he had arranged at least one gun for the robbery but that he himself did not have a gun, and that he had a pair of black leather gloves he planned to use in the robbery.

At Billingsley's trial, ATF Special Agent Christopher Bayless testified that, in his post-arrest statement, Billingsley admitted that two days prior to the robbery he had met with Lewis, who told him about the planned drug robbery. Billingsley stated that Lewis wanted him to act as the driver for the robbery, and that Lewis thought they'd get 15 kilograms of cocaine. Billingsley also said he later met with Lewis and a man he knew only as "V" (presumably Vernon Williams) and showed them both a gun.

Prior to trial, Lewis, Williams, and Billingsley all stipulated that 20 kilograms of cocaine is a distribution amount, not an amount for personal use. Billingsley also stipulated that some time prior to January 4, 2007, he had been convicted of a felony.

At trial, Lewis claimed entrapment. He claimed he started using cocaine because Rojo hooked him on it. He also said he eventually ran up a $1000 drug debt with Rojo. He testified that Rojo made comments which he took as a threat to himself or his family regarding payment of this debt, and it was only after this threat that

he gave in to Rojo's repeated requests that he meet Gomez and participate in the robbery of a cartel stash house. Lewis also acknowledged on cross-examination that in the video-recorded meetings with Rojo and Gomez, he did not appear to fear for his safety, he never attempted to call law enforcement authorities, and he never tried to move away. He said he was unable to borrow $1000 from any friend or relative and agreed to rob the stash house to satisfy this $1000 debt.

To rebut Lewis' entrapment defense, the government was allowed to introduce evidence of two prior convictions during its case-in-chief, specifically a 1995 conviction for possession of a firearm by a felon, and a 2000 conviction for theft (pled down from residential burglary). However, the district judge declined to allow in Lewis' 1991 conviction for commercial burglary, stating that it was too far removed in time and type to show a pattern of significant criminal conduct.

Prior to Billingsley's trial, Lewis had a recorded jailhouse conversation with his girlfriend, Rachel Roberts. During the conversation, he explained to Roberts that he wasn't guilty because he'd been entrapped by ATF agents, and that Billingsley was just "giving [him] a ride, basically," and had "no idea what was going on." Although Lewis testified at his own trial, when asked to testify at Billingsley's trial he invoked his Fifth Amendment right to remain silent. Billingsley's counsel moved to have Lewis' statement admitted as a hearsay statement against penal interest under Federal Rule of Evidence 804(b)(3). This motion was denied because the

district judge felt the statement lacked corroborating circumstances, rendering it trustworthy in light of the fact that it conflicted with Lewis' previous post-arrest statement.

The judge also denied another of Billingsley's hearsay motions. Agent Bayless was called by the government to testify as to Billingsley's post-arrest statement. On cross-examination, Billingsley attempted to ask Bayless about whether he had mentioned certain people (supposed original members of Lewis' crew) in his statement. Billingsley had not mentioned these people, and the government objected to the questioning on hearsay grounds. The judge upheld the objection over Billingsley's arguments that the statements were not hearsay because they were not being offered for the truth of the matter asserted.

Further, at both the Lewis/Williams and Billingsley trials, much was made of the actions of Agent Gomez, and the lack of recordings of the January 4 phone call and meeting. Gomez claimed that the initial call wasn't recorded because he'd made it when he was out to lunch, at a time when he didn't have a recording device. A bigger issue was the lack of recording of the pre-arrest meeting in Gomez's car during which Billingsley displayed the gun. This meeting was supposed to have been recorded, but prior to trial the government claimed that the recording device in the car had failed. The circumstances surrounding this failure were murky.

Generally, Gomez used two recorders; however, on this occasion he was only equipped with one. He testified

that this was because he believed another team of agents needed the second recorder, although some evidence was introduced to show that this belief was, at best, mistaken. Gomez was unable to explain why the recorder he did have failed, and the defendants were unable to examine the recorder themselves because Gomez explained he had sent it off to be repaired, but couldn't remember to whom he sent it for repairs, and had no paperwork relating to the repairs that could be used to track down its current location.

In fact, Gomez didn't even know the recording device had failed for two weeks, as it took him that long to attempt to listen to the tape. During the two-week gap in which Gomez assumed the recording had been successful, he did not safeguard the tape by logging it into storage as evidence. Instead, he kept it at his desk. After realizing that the recorder had malfunctioned, Gomez didn't immediately tell anyone, including his co-case agent and friend, Timothy Wilson, who sat at the next desk, despite the fact that Wilson was due to testify in front of the grand jury. Wilson subsequently testified inaccurately before the grand jury that the January 4 meeting was recorded, as Gomez had not yet informed anyone that the device had malfunctioned.

Finally, much was made at trial of inconsistencies between Gomez's testimony regarding the January 4 meeting in the car and observations regarding that meeting made by other members of the team who were surveilling the meeting. For example, Wilson testified that he had previously sworn affidavits, based on

information he'd received from Gomez, that Lewis did not exit Gomez's car, re-enter Billingsley's car, and then re-enter Gomez's car with Billingsley. This was contrary to Gomez's testimony.

Because of the questionable circumstances regarding the lack of recording of this meeting—the only meeting which put all three defendants and a government agent in proximity with a gun—and because of Gomez's overall behavior and testimonial inconsistencies, Lewis and Williams ask that we declare the evidence insufficient to support their convictions under § 924(c) as a matter of law. We review sufficiency of the evidence claims in the light most favorable to the government. *United States v. Gorman*, 613 F.3d 711, 715 (7th Cir. 2010) (citing *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006)). And we must uphold a jury's decision if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005).

Williams and Lewis argue that the evidence was so thoroughly corrupted by Gomez's behavior that it was insufficient to prove them guilty beyond a reasonable. *In re Winship*, 397 U.S. 358, 364 (1970). However, as we mentioned, Gomez was the subject of thorough and tough cross-examination, and much was made throughout trial of his inconsistent and questionable testimony. His testimony presented a classic question of credibility, and it is well settled that credibility assessments are the province of the jury. Given that the jury heard extensive arguments regarding Gomez's credibility, we decline to

find Gomez unreliable as a matter of law and so overrule jury findings on a matter well within the usual sphere of juror discretion.

Further, the jury could have disbelieved Gomez's testimony as to events on January 4 and still have found Lewis and Williams guilty of the § 924(c) count. To support a conviction under § 924(c), the government was required to prove that the defendant: (1) conspired to possess a controlled substance with intent to distribute; and (2) either knowingly possessed or carried a firearm in furtherance of, or during and in relation to this conspiracy, or could reasonably foresee that one of his co-conspirators would carry a firearm. *United States v. McLee*, 436 F.3d 751, 758 (7th Cir. 2006). Here, the jury could have discounted Gomez's testimony regarding January 4 and still have found that Williams and Lewis could reasonably have foreseen that someone would carry a gun, given the multiple recorded conversations in which the two discussed plans for a violent robbery of the stash house and ways to procure weapons for the robbery. Accordingly, the evidence was sufficient to convict both Williams and Lewis under § 924(c).

Lewis further argues that the evidence was insufficient to convict him under either § 846 or § 924(c) because the government failed to prove beyond a reasonable doubt that he was neither entrapped nor coerced as a matter of law. Where a defendant offers a defense of entrapment, the government must prove either that it did not induce the defendant to commit the crime, or that the defendant had a predisposition to commit the

crime. *United States v. Akinsanya*, 53 F.3d 852, 858 (7th Cir. 1995). Some relevant factors for a jury considering predisposition include: (1) the defendant's character or reputation; (2) whether the government suggested the criminal activity; (3) whether profit was involved; (4) whether reluctance was expressed which was overcome by government persuasion; and (5) the nature of the inducement or persuasion. *United States v. Millet*, 510 F.3d 668, 676 (7th Cir. 2007); *United States v. Casanova*, 970 F.2d 371, 375 (7th Cir. 1992). No single factor is dispositive, and the central question is whether the defendant showed reluctance to participate in the crime. *Millet*, 510 F.3d at 676; *United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999).

Here, Lewis claimed at trial that he only started doing cocaine because of Rojo. He further testified that Rojo asked him repeatedly to participate in a stash house robbery but that he had declined. Lewis testified that he only changed his mind and agreed to do the robbery after Rojo threatened to "send his boys to violate me and [Rojo] was going to beat me up," supposedly because Lewis owed Rojo a $1000 cocaine debt. Lewis' testimony was the only evidence that Rojo asked him more than once to commit the robbery, that he owed Rojo a debt or that Rojo threatened him. As Lewis acknowledged on cross-examination, there was videotape of him looking comfortable and unafraid in the presence of Rojo and Gomez. There were recordings of him agreeing to participate in, and enthusiastically planning, the robbery. He never tried to go to the police in relation to Rojo's

threat. He never tried to move. He could not borrow $1000 from anyone he knew, but instead agreed to rob a stash house guarded by armed drug cartel members to satisfy this debt. Further, evidence was introduced of Lewis' prior crimes, and Lewis acknowledged that he believed there to be a large amount of cocaine with a high cash value in the target stash house. Overall, there was enough evidence on which a jury could find the government had proved Lewis was predisposed to commit the robbery and therefore not entrapped, even if it believed Lewis' unsubstantiated testimony that he was threatened by Rojo.

Lewis' coercion claim fails on similar grounds. A defendant presenting a defense of coercion must show that: (1) he reasonably feared immediate death or serious bodily harm unless he committed the offense; and (2) there was no reasonable opportunity to refuse to commit the offense and avoid the threatened injury. *United States v. Jocic*, 207 F.3d 889, 892 (7th Cir. 2000). Lewis claimed that he could not borrow money to pay the debt, that he did not have enough money to move, and that he was too frightened to contact the police. Even if the jury credited his testimony on all of these points, there was nothing in Rojo's purported threat that suggested any immediacy such that it became coercive. For all these reasons, Lewis has failed to show that the evidence was insufficient to overcome his defense of entrapment or coercion.

Billingsley argues that there was insufficient evidence to sustain his convictions under § 846 and § 924(a) on

grounds relating to the distribution element of each charge. As a new argument on appeal, he argues that although he may have been part of a conspiracy, this was just a conspiracy to rob a stash house for drugs, and there was no evidence of his intent to distribute or knowledge that his co-conspirators were intending to distribute. Billingsley admits that he stipulated prior to trial that 20 kilograms of cocaine was a distribution amount. He also admits that he had been told there were between 15 and 20 kilograms of cocaine in the stash house. However, he points out that by special verdict he was only convicted of possession with intent to distribute a measurable amount of cocaine less than 500 grams, rather than in excess of 5 kilograms as was originally charged. Further, he stated at oral argument that even if he stipulated that 20 kilograms was a distribution amount, this does not mean that he actually knew, prior to the robbery, that 15 to 20 kilograms was a distribution amount.

Even were we to ignore Billingsley's stipulation as to distribution amount, there is still sufficient evidence to support a conviction on the distribution element. Billingsley knowingly agreed to rob a stash house guarded by armed cartel members. There was no evidence presented that he expected any money to be present. He admitted that he expected to steal 15 to 20 kilograms of cocaine from the stash house. A jury could reasonably believe that Billingsley, who had stipulated to a felony background, was aware that such a large amount of cocaine was optimal for distribution. A jury

could equally reasonably believe that no sane person would rob a stash house guarded by armed gang members to score some recreational drugs for personal use. For a jury to reach such a conclusion hardly requires the impermissible piling of inference upon inference, but rather is the sort of rational result from circumstantial evidence we ask juries to determine every day. *United States v. Sullivan*, 903 F.2d 1093, 1099 (7th Cir. 1990). There was sufficient evidence to support Billingsley's convictions.

Having determined that there was sufficient evidence for the convictions of Williams, Lewis, and Billingsley, we must now turn to specific evidentiary arguments made by Lewis and Billingsley. Lewis argued that evidence of his prior convictions should not have been admitted. Billingsley argues that Lewis' jailhouse statement regarding Billingsley's involvement should have been admitted, and that the hearsay objection relating to his cross-examination of Bayless should not have been sustained. We review these matters under an abuse of discretion standard. *United States v. Smith*, 454 F.3d 707, 716 (7th Cir. 2006); *United States v. Souffront*, 338 F.3d 809, 825 (7th Cir. 2003).

Lewis argues that the district judge abused her discretion by allowing the government to mention his 1995 and 2000 convictions during its case-in-chief. Under Fed. R. Evid. 404(b), evidence of a defendant's prior bad acts is not admissible "to prove the character of a person in order to show action in conformity therewith." However, when a defendant employs an entrapment de-

fense, evidence of prior bad acts is admissible to prove predisposition "because in such a case the defendant's predisposition to commit the charged crime is legitimately at issue." *United States v. Swiatek*, 819 F.2d 721, 728 (7th Cir. 1987). To be admissible however, this evidence must show an act that is similar enough and close enough in time to be relevant to the matter at issue, and its probative value must not be substantially outweighed by the danger of unfair prejudice. *Id.* at 727-28.

In admitting the convictions, the district judge explained that they showed "a pattern of behavior of someone who has an intent, first, to use a firearm unlawfully, and, secondly, to enter into a residence and commit theft." In its case-in-chief the government introduced merely the titles, dates and dispositions of Lewis' prior allowable convictions. Although Lewis argues that his 2000 theft conviction was far removed from his current conviction because it was for theft, not burglary, and because his current accomplices were not involved, the judge recognized that the charge underlying the theft plea was residential burglary, and so the conviction and the facts surrounding it could in fact show a pattern.

Lewis' 1995 conviction was admitted into evidence as "possession of a weapon by a felon," and Lewis argues now that the title of this conviction should have been sanitized to avoid unfair prejudice. Lewis was a felon in 1995 as the result of a conviction in 1991. At Lewis' request, the judge excluded this 1991 conviction from the government's case-in-chief because it was too far removed in time and circumstance. Lewis argues

that because the jury did not know what his prior felony conviction was for, it might assume something worse or more related to his current crime. The law in this circuit is well settled that for purposes of impeachment by prior conviction, it is appropriate to reveal the title, date, and disposition of the offense. *See, e.g.*, *Smith*, 454 F.3d at 716; *United States v. White*, 222 F.3d 363, 370 (7th Cir. 2000); *United States v. Smith*, 131 F.3d 685, 687 (7th Cir. 1997). Given this, we find that it was within the discretion of the district judge to allow the titles, dates, and dispositions of Lewis' 1995 and 2000 convictions into evidence.

Similarly we find that, although we might have ruled differently, the district judge did not abuse her discretion by denying Billingsley's request to receive in evidence Lewis' statement to his girlfriend, Ms. Roberts. Billingsley sought to have this statement admitted under Fed. R. Evid. 804(b)(3), which permits out-of-court statements made by an unavailable witness that are against the declarant's penal interest, provided corroborating circumstances clearly suggest that the hearsay statement is trustworthy. *United States v. Garcia*, 897 F.2d 1413, 1420 (7th Cir. 1990). In denying Billingsley's motion, the district judge stated,

> The Court assumes that Lewis and Roberts are unavailable to testify. Additionally, because the defense has not provided the statements to the Court for review, the Court also assumes that Lewis makes statements against his penal interest. To corroborate the truthfulness of the statement, Billingsley points

out that Lewis made the statement during an un-prompted conversation with his girlfriend. Nonetheless, the statements contradict Lewis' post-arrest statement that Billingsley agreed to assist in the robbery after Lewis told him about the details of the planned robbery and that he expected to acquire approximately fifteen kilograms of cocaine. Lewis' statement in the recorded phone call contradicts his post-arrest statement and lacks corroborating circumstances that would render it trustworthy.

Billingsley argues that the fact that Lewis made these statements in a private setting, to his girlfriend, and about a man he barely knew, corroborates the veracity of his statement. The government counters that the fact that the statements were made in the larger context of a conversation telling his girlfriend he'd been entrapped actually undermines the veracity of his statements to her, as he could be expected to curry favor by pleading his innocence to her. Also, the government contends that, technically, statements about Billingsley not knowing the plan are not inherently against Lewis' penal interest, especially when taken in the larger context of a conversation about entrapment. Regardless, and although we might have been inclined at a district level to allow Lewis' statement into evidence, given that the statement directly contradicted Lewis' post-arrest statement, and the context in which the statement was made, we don't believe the district judge abused her discretion by disallowing the introduction of this statement.

Next, we reach Billingsley's argument regarding cross-examination of Agent Bayless. Billingsley argues that by sustaining the government's hearsay objections during his cross-examination of Bayless, the district judge abused her discretion and violated the doctrine of completeness as codified in Fed. R. Evid. 106 and applied to oral statements by Fed. R. Evid. 611(a). *United States v. Li*, 55 F.3d 325, 329 (7th Cir. 1995). He also argues that this ruling denied him his Sixth Amendment right to confront and cross-examine witnesses against him, as well as his Fifth Amendment right to be free from penalty for refusing to take the stand in his own defense.

Agent Bayless was allowed to testify about Billingsley's post-arrest statement under Fed. R. Evid. 801(d)(2)(A), which provides that a party's own statement is not hearsay if the statement is offered against the party. However, on cross-examination, Billingsley attempted to question Bayless as to whether or not Billingsley had made certain statements not previously addressed by Bayless in his testimony. Apparently, Billingsley's strategy was to show a lack of connection with Lewis' gang, and one way he hoped to do so was by eliciting statements from Bayless that he had never mentioned certain members of the gang, such as "B" and "PJ," in his post-arrest statement. Billingsley's own out-of-court statements (or lack thereof) offered in support of himself are hearsay and the government objected to this line of questioning. Billingsley, unable to proffer a hearsay exception under which these statements would be admissible, suggested that they were not being admitted for the truth of the matter asserted, and were therefore

not hearsay. The judge upheld the government's objection, and pointed out that if Billingsley wanted to advance a defense theory about what he knew or didn't know at the time, he was certainly welcome to do so by taking the stand.

On appeal, Billingsley argues that the doctrine of completeness, as codified in Fed. R. Evid. 106 and applied to oral statements in Fed. R. Evid. 611(a) required the judge to overrule the government's objection. Under this doctrine, a complete statement is required to be read or heard when "it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." *United States v. Sweiss*, 814 F.2d 1208, 1211-12 (7th Cir. 1987). "The completeness doctrine does not, however, require introduction of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). Here, there was no suggestion during direct examination of Agent Bayless that Billingsley had interaction with or knowledge of "B" or "PJ." Nonetheless, Billingsley claimed that the testimony of Bayless regarding certain things (such as a cell phone picture Gomez showed Billingsley of guns), was misleading because the jury might assume a connection to "B" or "PJ" and therefore a greater involvement for Billingsley in the conspiracy.

We don't believe Bayless' testimony was confusing or misleading, nor do we believe the testimony Billingsley wished to pursue was explanatory of or relevant to

the admitted testimony. Rather, what Billingsley wished to have admitted was merely explanatory of his theory of the case. Therefore, we disagree that the doctrine of completeness should have been invoked here, and believe that the district judge was well within her discretion in finding that Billingsley's proposed cross-examination of Bayless was an attempt to bring impermissible hearsay before the jury.

As regards to his Sixth Amendment argument, Billingsley was given the opportunity to cross-examine and confront Bayless; he was just required to do so within the rules of evidence. Billingsley has provided no case law to support the theory that he must be allowed to ask any and all questions he desires, regardless of the evidentiary or other trial rules.

As for his Fifth Amendment argument, Billingsley was not penalized for declining to take the stand. He was provided a full and fair trial, governed by legitimate trial rules. Just because he would have had to take the stand to present his theory of the defense does not mean he was penalized for not doing so. What theory of defense to adopt, and whether or not to take the stand, are strategic choices made by defendants every day. At issue here were not exculpatory statements that implicated Billingsley's Fifth Amendment rights. *Marin*, 669 F.2d at 85 n.6. Nor, as we explained, was this a situation where selective testimony by the witness distorted the full picture or misled the jury such that the adequacy of repair work necessary to correct a misleading impression became a consideration. *United States*

*v. Walker*, 652 F.2d 708, 713 (7th Cir. 1981). For these reasons, Billingsley's constitutional rights were not violated by requiring him to comply with hearsay rules during Bayless' cross-examination.

Finally, Lewis and Williams argue that the district judge erred in imposing a mandatory consecutive sentence under § 924(c). In support of this argument, they cite cases from the Second and Sixth Circuits holding that a district court may not impose an additional consecutive term of imprisonment for violating § 924(c) where a defendant is also subject to a longer mandatory minimum sentence based on another count of conviction. *See United States v. Williams*, 558 F.3d 166, 168 (2d Cir. 2009); *United States v. Almany*, 598 F.3d 238, 239 (6th Cir. 2010).

However, as Lewis and Williams acknowledge, we have rejected the approach taken by the Second and Sixth Circuits, and have instead joined the majority of circuits in upholding the imposition of a mandatory consecutive sentence under § 924(c), regardless of any other mandatory minimum sentences imposed. *United States v. Easter*, 553 F.3d 519, 525-26 (7th Cir. 2009). Lewis and Williams offer no basis for revising this law, but wish to preserve this argument for appeal. Therefore, we find that the district judge did not err in imposing mandatory consecutive sentences under § 924(c).

For the foregoing reasons, the judgments of the district court are AFFIRMED.