In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2740

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THOMAS A. YARRINGTON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 08 CR 30115—**Jeanne E. Scott**, *Judge.*

ARGUED FEBRUARY 17, 2011—DECIDED MAY 6, 2011

Before EASTERBROOK, *Chief Judge,* and RIPPLE and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Thomas A. Yarrington was convicted by a jury of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and sentenced to 108 months' imprisonment. He appeals, arguing that the district court erred when it credited the government's reasons for using a peremptory challenge to exclude an African American from the

jury and abused its discretion when it allowed a government agent to read a portion of his report of an interview with a government witness into evidence. We affirm.

## I. Background

On May 22, 2008, law enforcement officers were conducting surveillance on an apartment at 734 Rickard Road in Springfield, Illinois. An individual named Jesse Joiner had informed them that a Jeremy Wallace was dealing drugs and using the apartment to store his drugs. Joiner also said that a person in the apartment named "Thomas" was involved in drug distribution with Wallace. Officers observed a white Chevy Tahoe pull into the apartment's parking lot, where it remained for a short time before leaving. Law enforcement had been advised that the Tahoe was used to deliver cocaine to the apartment. A traffic stop was initiated on the Tahoe, and the driver, Wallace, attempted to evade the officers in his vehicle and then fled on foot. They caught up with him in the bathroom of the car dealership where he worked. He was standing next to the toilet and appeared to be flushing something down it. His pants were down and he had white powder residue on them. The officers suspected that the white powder residue was cocaine, but it was never tested. Wallace was arrested.

Later that day, law enforcement made a traffic stop of a Chevy Avalanche driven by Yarrington after it left the apartment's parking lot. The officers advised

Yarrington that they were conducting a drug investigation, that Wallace was in custody, and that they knew Wallace had just left Yarrington's apartment. Yarrington gave consent to search his vehicle and consent to search his apartment. He stated that if something was found in his apartment, he was just holding it for someone. Yarrington subsequently said that he could not give consent to search the apartment because he didn't live there; it was his girlfriend's apartment. A short while later, Yarrington's girlfriend, Melody Pryor, arrived at the apartment and gave authorities written consent to search the apartment.

The apartment had three rooms upstairs: a bedroom with a bed in it, a bedroom with a lot of music equipment in it (the "music room"), and a bathroom. A search of the music room uncovered evidence of drug distribution: several large Ziploc bags, one of which contained 314.7 grams of cocaine; a digital scale; smaller sandwich baggies containing cocaine; two jars of Inositol powder (frequently used as a cutting agent with cocaine); and a box of sandwich baggies. A bank statement and bank check card in Yarrington's name were also in the music room. In the bedroom, agents found $14,800, some of which was in a black bag hidden under the bed.

Later that afternoon, Yarrington was interviewed at the jail. Special Agent Kevin Rollins of the Bureau of Alcohol, Tobacco, Firearms and Explosives and Lieutenant Brian Bressan of the Sangamon County Sheriff's Office advised him that a large quantity of cocaine, roughly over 1/4 kilogram, and other evidence of narcotics trafficking,

including a digital scale, bags with white powder residue, and a large amount of U.S. currency were recovered from the apartment. Yarrington was given his *Miranda* warnings and agreed to cooperate.

Both Lt. Bressan and Agent Rollins testified at trial about Yarrington's statements from the interview. Yarrington said he would take responsibility for the cocaine in the apartment; he didn't want his girlfriend to get in trouble for it. He said he received the cocaine from Wallace and stored it for him. Yarrington admitted that he cut the cocaine, by adding Inositol to it (thus increasing the weight), and weighed and packaged it for Wallace. Yarrington said he was paid $300 for every ounce of cocaine and he believed that he had $11,000 to $12,000 in the apartment. He claimed that some came from his music business, some from his modeling career, and some from the sale of drugs to Wallace. Yarrington stated that Wallace had been at the apartment that day, and he had given Wallace three ounces of cocaine for which Yarrington was to receive $900. The officers testified that Yarrington said his fingerprints would be on some of the bags of cocaine and that he had purchased the digital scale. The jury heard evidence that testing revealed Yarrington's latent fingerprints on the large Ziploc bag which contained the 314.7 grams of cocaine.

After Yarrington's arrest, law enforcement interviewed Thomas Summerlin, whom they identified through Wallace's cell phone records. Summerlin testified at trial about his dealings with Wallace and Yarrington.

Summerlin said that he bought cocaine from Wallace and distributed it to others to sell. He said that he first received drugs from Wallace in the summer of 2007 and met Yarrington "probably . . . about a month after Jeremy [Wallace] and [Summerlin] got together." Summerlin stated on cross-examination that he met Yarrington through Wallace early in the summer of 2007 and began receiving cocaine from Yarrington in midsummer, "around the end of June, maybe first of July of '07." He received half an ounce from Yarrington "[o]nce a week." Summerlin testified that after he met Yarrington, he stopped getting his cocaine from Wallace and got it directly from Yarrington. Summerlin said that his drug relationship with Yarrington ended sometime in 2008. When Summerlin received cocaine from Yarrington, he cut it up into different portions and gave it to others for distribution. He said he phoned Yarrington about once a week to arrange to buy cocaine; the conversations lasted "maybe a minute." Phone records admitted into evidence showed that from August 2007 through April 2008, 74 calls were placed from Summerlin's phone to Yarrington's phone, and 70 calls were made from Yarrington's phone to Summerlin's phone. The majority of these calls were for one minute or less.

Summerlin testified that he was interviewed by law enforcement on September 8, 2008, and August 7, 2009. Defense counsel questioned him about his statements: "[D]id you not tell Agent Rollins that from September of 2007 for three to four months . . . you were purchasing half ounce quantities of cocaine from Jeremy

Wallace once a week? Would you agree you told Agent Rollins that on September 8th, 2008?" Summerlin answered, "Yeah, if that's in the statement I must have said that." When confronted with the discrepancy between his September 8 statement and his trial testimony, Summerlin explained, "I started off with Jeremy in the summer of '07, he introduced me to Thomas after that, and then I was buying from Thomas." Summerlin added, "Well, maybe I've got my dates wrong." Summerlin admitted that on August 7, 2009, he stated he bought one-half ounce quantities of cocaine from Wallace for two or three weekends. Summerlin agreed that this statement conflicted with his September 8 statement.

Defense counsel questioned Summerlin whether he told Agent Rollins on September 8 that in December 2007, he began purchasing two ounces of cocaine per week from Yarrington. Summerlin responded, "If it's on the statement I must have told him that." (Actually, it was in the August 7 statement.) Counsel pressed: "So December of '07, that's when you began purchasing? . . . Is that right?" Summerlin responded, "Obviously I have my dates wrong. . . . I have a problem with the dates." He admitted that in his August 7 statement he said that he bought three- and four-ounce quantities of cocaine from Yarrington. Defense counsel focused even more on the September 8 statement: "On September 8th . . . in your interview with Agent Rollins, did you not tell [Agent Rollins] that . . . Wallace is the only person that you had purchased cocaine from?" Summerlin said he did not remember.

Agent Rollins was recalled and testified that at the very beginning of the September 8 interview, Summerlin said Wallace was the only person from whom he had ever purchased cocaine. The agent explained, however, that he conducted the interview chronologically and that Summerlin said during the early period of his relationship with Wallace, he purchased cocaine only from Wallace, and in the later period, he began purchasing cocaine from Yarrington.

At that point, the government moved for the admission of Agent Rollins's report of the September 8 interview. Yarrington objected on relevance grounds. The government argued that the report was relevant because defense counsel's questioning implied that certain statements were not in the report. The government referred to the rule of completeness. The court reserved ruling.

On re-cross-examination, Yarrington's counsel asked Agent Rollins about Summerlin's September 8 statements:

Q. Now, the report of September 8th . . . at some point . . . Summerlin told you that Wallace was the only person that he purchased cocaine from, isn't that right?

A. Correct.

Q. And I understand he later said that he purchased cocaine from Wallace and then Yarrington and gave certain amounts, correct?

A. Correct.

On redirect, the government asked Agent Rollins whether his September 8 report started in one period and ended in another, in chronological order. He said, "yes." The government then asked, "In which period is the statement that Jeremy Wallace was the only person that Summerlin purchased from?" The agent responded, "That statement is made in paragraph 3 of 19 paragraphs." At this point, citing awkwardness and an inability to otherwise show what was or was not in the report, the government asked that Agent Rollins be allowed to read portions of the report.

The court allowed him to read paragraphs 3 through 7 of the report to the jury over the defense objection. These paragraphs state in relevant part:

> Paragraph 3. Approximately one year ago WALLACE approached SUMMERLIN about purchasing cocaine from him (WALLACE). . . . According to SUMMERLIN, WALLACE is the only person that he has purchased cocaine from.

> Paragraph 4. SUMMERLIN initially started purchasing half ounces of cocaine from WALLACE. . . .

> Paragraph 5. . . . SUMMERLIN estimated that he purchased half ounce of cocaine once a week for approximately three to four months from WALLACE.

> Paragraph 6. At that point in time, SUMMERLIN began purchasing two ounces of cocaine per week. In addition, WALLACE brought a subject

he identified as "Thomas" to SUMMERLIN'S residence. . . . SUMMERLIN subsequently identified a photograph of Thomas A. YARRINGTON . . . as "Thomas."

Paragraph 7. It was at that time he started purchasing two ounces of cocaine per week that SUMMERLIN began making the purchase of cocaine directly from YARRINGTON.

After Agent Rollins read this, the court gave the following limiting instruction:

Ladies and gentlemen, those portions of Mr. Rollins' report were read to you for the purpose of showing what Mr. Rollins recorded in his report concerning his interview with Mr. Summerlin. The statements in the report are not offered to prove the truth of those statements, but simply to prove what was reported by this witness of his interview with Mr. Summerlin. Since there's been some focus on what was in that report I have allowed this portion of the report to be read to you.

The court did not admit the report as an exhibit.

The jury convicted Yarrington of one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). He was sentenced to 108 months' imprisonment. He appeals his conviction, challenging the government's peremptory strike of an African American and the reading of portions of the September 8 interview report into evidence.

## II. Analysis

## A. *Batson* Challenge

Yarrington first claims that the district court failed to conduct a meaningful inquiry into the government's reasons for using a peremptory challenge against Michelle Hudson, an African American prospective juror, and erred in accepting the government's explanation for striking her. During voir dire, Hudson stated that she believed she recognized the names of two of the potential witnesses: Randy Raglin, with whom she attended high school, and Digollah Addison, with whom she had worked. Addison was present in the courtroom at the time, and Hudson confirmed that she knew her. Addison had been Hudson's nursing supervisor. Hudson also stated that she had been a witness in a murder trial. On her juror questionnaire, however, she indicated "N/A" to Question 13, which inquired whether she had ever been involved in criminal litigation, including as a witness. The government exercised a peremptory challenge against Hudson, and Yarrington's counsel requested that it be required to provide a race-neutral reason for striking her. Defense counsel noted that Hudson was one of three African Americans in the jury pool, and the only one at that point to make it into the jury box.

The government proffered four reasons for striking Hudson: (1) she knew two potential defense witnesses; (2) her daughter's last name was a name known to law enforcement; (3) she indicated "not applicable" on Question 13 of her juror questionnaire; and (4) unlike the

other prospective jurors, she never looked either of the government attorneys in the eye. The district court rejected the last reason, noting that Hudson had been looking at the court, which was in a different direction. Yarrington's counsel responded that Hudson stated she could be fair and impartial and her knowledge of the witnesses would not affect her ability to be a fair and impartial juror. The district court determined that "the fact that one of the defense witnesses was her nursing supervisor and another witness went to high school [with her] . . . and the fact that law enforcement is apparently aware of the daughter, are sufficient for use of the peremptory as race-neutral reasons." When ruling on Yarrington's motion for a new trial, the district court revisited the *Batson* claim and concluded that "[t]hese personal and professional relationships with potential defense witnesses called into question Hudson's ability to be a fair and impartial juror."

Claims under *Batson v. Kentucky*, 476 U.S. 79 (1986), are evaluated under a three-step inquiry. First, the defendant must make a prima facie case of race discrimination in selection of the venire. Second, the government must offer a race-neutral explanation for the peremptory strike. Third, the court must determine whether the defendant has carried his burden of proving that the government's stated reason is a pretext for discrimination. *United States v. Taylor*, Nos. 05-2007, 05-2008 & 09-1291, ___ F.3d ___, ___, 2011 WL 799775, at *4 (7th Cir. Mar. 9, 2011); *United States v. McMath*, 559 F.3d 657, 663 (7th Cir. 2009). "Traditionally, we review the district court's *Batson* findings for clear error." *McMath*, 559 F.3d

at 663. But where the court misapprehends or misapplies the *Batson* inquiry, de novo review is appropriate. *Id.* at 663 & n.2.

Yarrington contends that the district court failed to conduct a meaningful inquiry into the government's stated reasons for striking Hudson, but the record establishes that the court conducted a proper *Batson* inquiry. Thus, we review its findings for clear error and will reverse only if we "have a 'firm and definite conviction that a mistake was made.'" *Taylor*, 2011 WL 799775, at *4 (quoting *United States v. Taylor*, 509 F.3d 839, 843 (7th Cir. 2007)). This case focuses on the second and third steps of the inquiry. (Where the government offers a race-neutral explanation for the strike, whether the defendant has established a prima facie case is moot. *United States v. White*, 582 F.3d 787, 801 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1542 (2010).) The district court's finding on the question of discriminatory intent involves a credibility determination, to which we accord substantial deference. *Batson*, 476 U.S. at 98 n.21; *Taylor*, 509 F.3d at 843.

We will focus on the first two reasons the government proffered for striking Hudson: (1) she knew two defense witnesses, one of whom had been her supervisor at work; and (2) law enforcement had knowledge of her daughter's last name. That Hudson knew a potential witness from school and had worked under another potential witness are race-neutral reasons for a peremptory strike. *See, e.g.*, *United States v. Sandoval*, 241 F.3d 549, 552 (7th Cir. 2001) (holding district court did not

abuse its discretion in removing a juror during trial who informed it that she knew a witness and replacing her with an alternate). At *Batson*'s second step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991); *see also United States v. Hendrix*, 509 F.3d 362, 370 (7th Cir. 2007). There is nothing inherently discriminatory in the second reason offered for striking Hudson; therefore, this reason is deemed race neutral.

So we move on to the third step of the *Batson* inquiry in which we assess the "'*honesty*—not the accuracy—of a proffered race-neutral explanation.'" *White*, 582 F.3d at 802 (quoting *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006)). The district court found the first two race-neutral reasons proffered by the government credible, thus justifying the peremptory strike. Yarrington argues that the government failed to support its claim that its stated reasons were race neutral with "anything concrete." However, the district court questioned Hudson about her knowledge of the witnesses; her answers establish a factual basis for the government's first proffered reason for striking her. Yarrington also complains that the district court did not inquire into the nature of law enforcement's knowledge of Hudson's daughter's name. But the court apparently understood the implication of the assertion that law enforcement knew of Hudson's daughter's last name. We can reasonably infer this from the fact that the court credited this reason as a race-neutral explanation and found it sufficient to support the peremptory challenge.

Next Yarrington attempts to challenge the government's reasons by pointing to three jurors who were accepted by the government. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005); *see also United States v. Stephens*, 514 F.3d 703, 711 (7th Cir. 2008) ("Credibility may also be evaluated by considering the offering party's consistency in applying its non-discriminatory justification."). The first juror Yarrington identifies worked as a secretary in a school district and knew defense *counsel* as a student in high school, but didn't know him well. The second juror said that he recognized a couple of surnames of possible witnesses, and he had casual acquaintances from ten or more years back who had those surnames, but he had no idea if there was any relationship. In contrast with these jurors, Hudson actually knew two potential witnesses—she attended high school with one of them and had worked under the other. The third juror had a sister serving time in the department of corrections for forgery, which bears no similarity to Hudson's situation. The government's reasons for striking Hudson do not likewise apply to these jurors.

Yarrington has given us no reason to find that the district court clearly erred in crediting the government's proffered race-neutral reasons for striking Hudson. Therefore, his *Batson* challenge fails.

### B. Summerlin Interview Summary

Yarrington's second argument is that the district court abused its discretion in allowing portions of the report of the September 8 interview of Summerlin to be read into evidence. The government argues that defense counsel took portions of the report out of context, and the court allowed the jury to hear Summerlin's reported statements in proper context. It cites the doctrine of completeness. We review the court's evidentiary ruling for an abuse of discretion. *See United States v. Lewis*, Nos. 09-3954, 09-3961 & 10-1204, ___ F.3d ___, 2011 WL 1261146, at *9-10 (7th Cir. Apr. 6, 2011).

The doctrine of completeness, codified in Federal Rule of Evidence 106, is applied to oral statements. *Id.* at *9. "Under this doctrine, a complete statement is required to be read or heard when 'it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.'" *Id.* (quoting *United States v. Sweiss*, 814 F.2d 1208, 1211-12 (7th Cir. 1987)). The government argues that defense counsel used one sentence out of context from the September 8 statement to claim that Wallace was the only person from whom Summerlin reported purchasing cocaine. The government asserts that the report clarifies that Summerlin informed Agent Rollins that he bought cocaine from both Wallace and Yarrington.

The reading of the portions of the report does not seem to fit within the rule of completeness. The jury had already heard that Summerlin stated during his Septem-

ber 8 interview with Agent Rollins that he purchased cocaine from both Wallace and Yarrington. Agent Rollins had testified that in that interview, Summerlin said that during the early part of his relationship with Wallace, he purchased cocaine only from Wallace, but in the later part of the relationship, he purchased from Wallace and Yarrington. Although Summerlin's testimony may have been confusing with respect to the time periods in which he purchased cocaine from Wallace and Yarrington, the reading of portions of the report was unnecessary to provide the jury with a complete view of Summerlin's statements in the September 8 interview. The reading of portions of the report likely served the purpose of rehabilitating Summerlin.

Even if the district court abused its discretion in allowing Agent Rollins to read portions of his report, we would not reverse if the evidentiary mistake was harmless error. An error is harmless if, "in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *United States v. Vasquez*, 635 F.3d 889, 898 (7th Cir. 2011) (quoting *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007)). In other words, an error is harmless "if it did not have a 'substantial and injurious effect or influence on the jury's verdict.'" *United States v. Oros*, 578 F.3d 703, 709 (7th Cir. 2009) (quoting *United States v. Tarrett*, 133 F.3d 519, 526 (7th Cir. 1998)). The government bears the burden of proving "that a reasonable jury would have reached the same verdict

without the challenged evidence." *Vasquez*, 635 F.3d at 898. The government has done so here.

We highlight just some of the evidence. Law enforcement recovered from the apartment Yarrington shared with his girlfriend several bags containing cocaine, several empty baggies, a digital scale, Inositol powder (which is commonly used to cut cocaine), and approximately $14,000 in cash. A special agent with the Drug Enforcement Administration testified that all of these items were consistent with cocaine distribution. The agent also testified that the amount of cocaine found in the apartment was not consistent with possession for personal use but for distribution or sale. The jury heard that Yarrington had claimed responsibility for the cocaine. Government witnesses testified that Yarrington told them that he stored, cut, weighed, and packed the cocaine for Wallace in return for money. The jury heard other testimony pointing to Yarrington's guilt, including that he had admitted he had a large sum of cash in the apartment, some of which was drug money, and that his fingerprints were found on a bag of cocaine found in the apartment. Not to mention, the jury was entitled to credit Summerlin's testimony that he bought cocaine from Yarrington and distributed it to others to sell, despite Summerlin's difficulty in recalling dates and quantities. In addition, the court gave the jury a limiting instruction, telling it that the portions of the report were read for the purpose of showing what Agent Rollins recorded in his report of his interview with Summerlin, not to prove the truth

of the statements. This limiting instruction "mitigated whatever unfair prejudice may have existed*." United States v. Samuels*, 521 F.3d 804, 814 (7th Cir. 2008) (quoting *United States v. Lane*, 323 F.3d 568, 582 (7th Cir. 2003)). Given the substantial evidence against Yarrington, the reading of portions of the report was harmless error.

### III. Conclusion

We find no merit in Yarrington's *Batson* claim, and the district court's decision to allow Agent Rollins to read into evidence portions of his interview report, even if an abuse of discretion, was harmless error. We therefore AFFIRM Yarrington's conviction and the district court's judgment.