**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 13-4138**

───────────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

    v.

DEANGELO MCLAURIN,

              Defendant - Appellant.

───────────────

**No. 13-4139**

───────────────

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

    v.

NICHOLAS LOWERY,

              Defendant - Appellant.

───────────────

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:11-cr-00111-RJC-DSC-1; 3:11-cr-00111-RJC-DSC-2)

───────────────

Argued: March 26, 2014          Decided: August 22, 2014

───────────────

Before TRAXLER, Chief Judge, FLOYD, Circuit Judge, and HAMILTON, Senior Circuit Judge.

---

No. 13-4138 affirmed in part, vacated in part, and remanded; No. 13-4139 affirmed by published opinion. Chief Judge Traxler wrote the majority opinion, in which Senior Judge Hamilton joined. Judge Floyd wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:** Joshua B. Carpenter, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina; Lawrence W. Hewitt, GUTHRIE DAVIS HENDERSON & STATON, Charlotte, North Carolina, for Appellants. William Michael Miller, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Henderson Hill, Executive Director, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant Deangelo McLaurin. Justin N. Davis, GUTHRIE DAVIS HENDERSON & STATON, Charlotte, North Carolina, for Appellant Nicholas Lowery. Anne M. Tompkins, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

TRAXLER, Chief Judge:

Working with disgruntled drug couriers, defendants Deangelo McLaurin and Nicholas Lowery devised a plan to rob a drug "stash house." As it turned out, the stash house never existed, and the supposed drug couriers were undercover law enforcement officers. McLaurin and Lowery were arrested and ultimately convicted of various conspiracy and firearms charges. Finding no reversible trial error, we affirm their convictions. As to defendant McLaurin, however, we vacate his sentence and remand for resentencing.

I.

On February 23, 2011, a confidential informant introduced defendant McLaurin to undercover police officer Rolando Ortiz-Trinidad of the Charlotte Mecklenburg Police Department. At the meeting, McLaurin sold Officer Ortiz a .38 caliber revolver for $200. At the end of the transaction, McLaurin told Ortiz that he had a shotgun for sale as well. Officer Ortiz and McLaurin then exchanged telephone numbers in order to contact each other about future transactions. Two days later, Ortiz and McLaurin met for a second transaction in which McLaurin sold Ortiz a sawed-off shotgun for $150. Shortly thereafter, McLaurin called Officer Ortiz and offered to sell him a third firearm.

Following the firearms transactions, the confidential informant identified McLaurin as a potential target for a

3

reverse sting operation known as a home-invasion investigation or a stash-house robbery. A home-invasion investigation is a law enforcement technique in which law enforcement officers identify targets who are ready, willing, and able to rob a drug stash house and then provide them with the opportunity to commit the crime. The officers who participate in this type of undercover operation receive specialized training and employ techniques to weed out individuals who are not inclined to commit the robberies, including changing locations and scheduling several meetings in advance of the planned robbery. The purpose of these obstacles is to give targets the "opportunity to not participate in this particular style of robbery." J.A. 144.

On March 9, 2011, the confidential informant introduced McLaurin to two different undercover officers -- ATF Special Agent Shawn Stallo and his partner Task Force Officer Ashley Asbill (referred to together as the "Undercover Officers"). This meeting was recorded on audio and video; McLaurin, the confidential informant, and the Undercover Officers were present at all times.

During the meeting, the Undercover Officers posed as disgruntled drug couriers for a Mexican drug trafficking organization (the Organization), and expressed their desire to steal drugs from a stash house belonging to the Organization.

4

Agent Stallo told McLaurin that he regularly picked up cocaine from various rental houses used by the Organization as stash houses, and that he was looking for someone to rob one of these stash houses. According to the cover story that Agent Stallo told McLaurin, each stash house, when stocked, contained between seven to nine kilograms of cocaine and was guarded by two armed men; the Organization constantly changed which stash house held the stock; Stallo picked up two kilograms of cocaine from a stocked stash house about every 30 days, but would not learn the address of such stash house until the day of the pick-up. Stallo proposed to keep two kilograms of the stolen cocaine for himself, while McLaurin and any others he recruited to help in robbing the stash house could keep the balance because they would be responsible for the "heavy lifting." J.A. 148.

In response, McLaurin indicated that he was interested in the robbery, assuring the Undercover Officers that he had committed a similar robbery in the past. McLaurin also told the Undercover Officers that he would have to obtain a firearm before the robbery because he had recently sold his gun. When discussing the type of firearm required for the job, McLaurin indicated that he would need a large-caliber weapon. McLaurin also explained that the job was "real big," J.A. 342, and that it would therefore take him three or four days to recruit others to help him in the robbery.

Consistent with his training, Agent Stallo made clear to McLaurin several times during the meeting that he did not have to go through with the robbery if he did not want to, including telling McLaurin to take a few days to consider whether he wanted to participate. If McLaurin still wanted to participate, he was to call the confidential informant, who would then get in touch with Stallo. McLaurin responded that he was "good with it," J.A. 151, assuring the Undercover Officers that he would be in touch and that they would meet again.

A little over two weeks went by without the case agents being able to contact the confidential informant to learn whether McLaurin had expressed interest in the potential robbery. As a result, Agent Stallo attempted to contact McLaurin by telephone. McLaurin called back within minutes after Stallo left a message, and the two agreed to meet the next day, March 25, 2011, to discuss further plans for the robbery. On the day of the meeting, McLaurin called Stallo and advised him that he would be bringing along an associate -- codefendant Nicholas Lowery -- who would assist in the robbery. The Undercover Officers, McLaurin, and Lowery met in the parking lot of a restaurant; the 45-minute-long meeting was again recorded on audio.

During the meeting, McLaurin and Lowery discussed their specific plans for the robbery. McLaurin stated that upon

6

entering the house, he would demand that everyone "get on the ground, face down." J.A. 193. Lowery added that he would strike anyone who resisted with the butt of his gun or shoot them in the leg if necessary. With respect to the need for firearms, Lowery indicated that he had a gun on him then, see J.A. 177 (Lowery patted himself and stated that he was "strapped right now"), and that he had additional handguns at his disposal. According to Lowery, the job potentially called for a "K," referring to an AK-47 rifle, because it was more powerful and could "chop ligaments." J.A. 177. When discussing the cocaine that McLaurin and Lowery planned to steal, Lowery explained in detail how he would distribute it, and he also offered to help sell Agent Stallo's share of the drugs.

During the discussion, Lowery stated that there were "three things you gotta consider . . . when you do stuff. . . . Getting killed, going to prison, or killing another motherf***er." J.A. 360. Lowery continued, "And if you ain't willing to accept those consequences," and McLaurin interjected, "Don't get involved." J.A. 360. At the conclusion of the meeting, Agent Stallo reiterated that if McLaurin and Lowery did not want to go through with the robbery, they should just forget about him and the plan.

On April 6, 2011, the Undercover Officers again met with McLaurin and Lowery and again recorded the meeting. The

7

Undercover Officers went over the details of the planned robbery, and McLaurin and Lowery confirmed their commitment to the plan. Lowery mentioned purchasing an assault rifle for the robbery, characterizing the expenditure as an investment. In discussing the specifics of the robbery, McLaurin reiterated that his plan was to get everyone on the ground.

In the days following the meeting, Agent Stallo corresponded with McLaurin nearly every day in calls or text messages initiated by both parties. During the course of those conversations, Agent Stallo told McLaurin that the robbery would take place on April 11, and that he would call McLaurin to give him the location. The Undercover Officers set up an initial meeting at a gas station to confirm that McLaurin and Lowery had the firearms and other tools necessary for the robbery and to identify any other individuals that McLaurin and Lowery had recruited to participate in the robbery. After the preliminary meeting, the plan was to lead the group to a nearby storage facility that was under law enforcement control so that they could safely make the arrests.

On April 11, McLaurin and Lowery arrived at the gas station as scheduled. When McLaurin and Lowery spoke with the Undercover Officers, Lowery pointed to another vehicle parked nearby and indicated that the individual in the car would join in the robbery. The Undercover Officers then drove to the

8

storage facility, with McLaurin and Lowery following in their car and the other individual trailing in the third car. The Undercover Officers and McLaurin and Lowery entered the parking lot, but the unknown participant drove past the storage facility. When Lowery and McLaurin arrived, Agent Stallo overheard Lowery on the telephone state, "[E]verything looks good here. Everything's looking cool." J.A. 222.

Agent Stallo then asked McLaurin whether they had the "tools," meaning firearms, for the robbery or whether they had to wait for the third individual. J.A. 223. McLaurin responded that he thought Lowery had them. At that point, rather than wait on the other participant, Agent Stallo initiated the arrests of McLaurin and Lowery, concerned that either one of them could relay a message to the other unknown individual.

Following the arrests, a search of McLaurin and Lowery's vehicle revealed a pair of pants, gloves, a bandana, and a toboggan hat. Concerned that the guns were in the other vehicle, Agent Stallo instructed the surveillance team to be on the lookout for the suspected third participant and told them to arrest him if they were able to make contact. Despite searching with a helicopter and several additional officers, law enforcement was unable to locate the third participant or his vehicle.

9

Following their arrests, both McLaurin and Lowery waived their Miranda rights and agreed to speak with law enforcement. McLaurin admitted that he was supposed to meet Agent Stallo that day to "do a job and to make some money." J.A. 416. After providing several explanations of what the "job" entailed, McLaurin eventually admitted that the plan was to go into a house to get five to seven kilos of cocaine that they would then sell. McLaurin also claimed that he did not have a gun, asserting that although he asked Agent Stallo to get him a firearm, he did not plan on using it. According to McLaurin, rather than steal the cocaine, he planned to "go to the house and ask the Mexicans to front him the seven bricks or the 7 kilos." J.A. 429. McLaurin also initially denied possessing and selling guns on February 23 and 25, 2011. Eventually, however, he admitted to his participation in the transactions but said that he found the pistol and sawed-off shotgun in the woods.

In his statements to law enforcement, Lowery denied any involvement in the planned robbery. Lowery acknowledged meeting with Agent Stallo but asserted that he had no intention of going through with the robberies and that he had told Stallo that he would not participate. Lowery claimed that he was only providing McLaurin a ride to the storage facility and denied any

10

knowledge of the other car that the Undercover Officers suspected contained the firearms and the third participant.

McLaurin and Lowery were each ultimately charged with three counts of conspiracy arising directly from the stash-house sting:  (1) conspiracy to interfere with commerce by threats of violence, in violation of the Hobbs Act, 18 U.S.C. § 1951(a); (2) conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846; and (3) conspiracy to use or carry a firearm in furtherance of a crime of violence and a drug trafficking offense, in violation of 18 U.S.C. § 924(c).  In addition to the conspiracy counts, McLaurin was charged with two counts of possession of a firearm by a convicted felon, and Lowery was charged with one count of possession of a firearm by a convicted felon, all in violation of 18 U.S.C. § 922(g)(1).  McLaurin's felon-in-possession counts related to his possession of the .38 caliber pistol and sawed-off shotgun during the undercover transactions with Officer Ortiz on February 23 and 25, 2011. Lowery's felon-in-possession count stemmed from his possession of a .40 caliber pistol on July 28, 2010.

McLaurin and Lowery each moved to sever the felon-in-possession counts from the conspiracy counts, contending that the counts were unrelated.  The district court granted the motion with respect to Lowery but denied it with

11

respect to McLaurin. McLaurin and Lowery were tried together before a jury on the remaining counts, and both relied primarily on an entrapment defense. The jury rejected the defense and convicted McLaurin and Lowery on all three conspiracy counts and convicted McLaurin on both felon-in-possession counts. The district court sentenced McLaurin to 151 months in prison and Lowery to 168 months. These appeals followed.

## II.

The Defendants first challenge the district court's instructions on their entrapment defense. "Although we review a district court's refusal to give a jury instruction for abuse of discretion, we conduct a de novo review of any claim that jury instructions incorrectly stated the law." United States v. Mouzone, 687 F.3d 207, 217 (4th Cir. 2012) (citation omitted), cert. denied, 133 S. Ct. 899 (2013).

Entrapment is an affirmative defense consisting of "two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." Mathews v. United States, 485 U.S. 58, 63 (1988). Consistent with Mathews, the district court instructed the jury that the elements of the defense were government inducement and lack of predisposition, see J.A. 615, and the court then explained the manner in which the defense operates:

12

Thus, where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, that person is a victim of entrapment, and the law as a matter of policy forbids that person's conviction in such a case.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that government agents provide what appears to be a favorable opportunity is not entrapment.

For example, it is not entrapment for a government agent to pretend to be someone else and to offer either directly or through an informer or other decoy to engage in an unlawful transaction.

If then, you should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit a crime such as charged in the indictment, whenever opportunity was afforded, and that government officers or their agents did no more than offer the opportunity, then you should find that the defendant is not a victim of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the government, then it is your duty to find the defendant not guilty.

The burden is on the government to prove beyond a reasonable doubt that the defendant was not entrapped.

J.A. 615–17. The Defendants do not challenge these instructions; instead, they challenge the supplemental instruction given after the jury requested clarification of the term "inducement."

13

In response to the jury's inquiry, the district court instructed the jury that "inducement requires more than mere solicitation by the government. <u>Inducement is a term of art necessitating government overreaching</u> and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." J.A. 925-26 (emphasis added). The Defendants contend that the underlined language improperly permitted the jury to reject the entrapment defense based on a non-factual, value-laden determination that the government had not overreached, without ever considering the core issue of an entrapment defense – predisposition. See Mathews, 485 U.S. at 63 (describing predisposition as "the principal element in the defense of entrapment" (internal quotation marks omitted)).

We find no error in the district court's instruction. The unobjected-to general entrapment instructions quoted above made it clear to the jury that an entrapment defense consists of two elements and that the defense could be rejected on either the inducement prong or the predisposition prong. The supplemental "inducement" instruction did not remove the predisposition element from the jury's consideration any more than the agreed-upon general instructions did. Instead, the supplemental instruction simply elaborated on the circumstances that can be considered inducement, and did so in a manner consistent with the law of this circuit. See United States v. Daniel, 3 F.3d

14

775, 778 (4th Cir. 1993) ("'Inducement' is a term of art: it involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party."). Under these circumstances, we reject the Defendants' challenge to the jury instructions.[1]

## III.

The Defendants next contend that the district court erred by admitting evidence of prior bad acts under Rule 404(b) of the Federal Rules of Evidence. McLaurin contends the court erred by admitting evidence that McLaurin had been convicted of common law robbery in 2003, while Lowery contends the court erred by admitting evidence that he possessed a firearm on July 28, 2010.

## A.

Rule 404 generally prohibits evidence of other crimes or bad acts to prove the defendant's character and conduct in accordance with his character. See Fed. R. Evid. 404(b)(1). Such evidence, however, may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Evidence of prior bad acts

---

[1] Because we find no error in the jury instructions, we need not consider the government's assertion that Defendant Lowery waived his right to challenge the issue by affirmatively informing the district court that he had no objection to the supplemental instruction.

15

under Rule 404(b) is admissible when the following criteria are met:

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997).

Although it is not mentioned in the rule, there is no doubt that proving predisposition is one of the purposes for which bad-act evidence may be admissible. See, e.g., United States v. Cervantes, 706 F.3d 603, 615 (5th Cir. 2013) ("[E]vidence of prior acts intended to rebut an entrapment defense falls within the ambit of Rule 404(b)."); United States v. Murzyn, 631 F.2d 525, 529 n.2 (7th Cir. 1980) ("[O]ne of the 'other purposes' mentioned in Rule 404(b) is proof of predisposition."); United States v. Burkley, 591 F.2d 903, 921 (D.C. Cir. 1978) ("[P]roving predisposition in an entrapment case is not explicitly mentioned in Rule 404(b) as a permissible basis for introducing evidence of other crimes, but . . . it has always been so considered.").

16

When applying Rule 404(b) to entrapment cases, however, the nature of the defense and the burden it places on the government must be kept in mind. "'Predisposition' refers to the defendant's state of mind before government agents make any suggestion that he shall commit a crime," United States v. Osborne, 935 F.2d 32, 37 (4th Cir. 1991); the focus of the predisposition inquiry is on "whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." Mathews, 485 U.S. at 63.  As the D.C. Circuit has explained,

> proving disposition to commit a crime is very close to proving "criminal propensity," the very type of prejudice against which the general prohibition on admission of evidence of other crimes is directed.  In an entrapment case, however, the issue is precisely whether the accused, at the time of the government inducement, had a propensity to commit crimes of the nature charged -- that is, whether he was predisposed to do so.

Burkley, 591 F.2d at 922.

The assertion of an entrapment defense does not justify admission of every bad act ever done by the defendant, see United States v. Swiatek, 819 F.2d 721, 728 (7th Cir. 1987), but distinguishing the unwary innocent from the unwary criminal nonetheless requires a "searching inquiry," United States v. Hunt, 749 F.2d 1078, 1082 (4th Cir. 1984) (internal quotation marks omitted).  Predisposition is itself a broad concept, and a broad swath of evidence, including aspects of the defendant's

17

character and criminal past, is relevant to proving predisposition. See Cervantes, 706 F.3d at 618 (explaining that "the character of the defendant, including past criminal history" is relevant to predisposition); United States v. Khalil, 279 F.3d 358, 365 (6th Cir. 2002) ("[T]he character or reputation of the defendant, including any prior criminal record" is relevant to establishing predisposition); United States v. Ramsey, 165 F.3d 980, 985 n.6 (D.C. Cir. 1999) (defendant's "past illegal conduct" is relevant to proving predisposition); United States v. Thomas, 134 F.3d 975, 980 (9th Cir. 1998) ("For the jury to find predisposition beyond a reasonable doubt, it must consider the defendant's character."). Given the range of evidence that is relevant to the predisposition issue, certain bad-act evidence may be admissible under Rule 404(b) in entrapment cases that would not be admissible in cases where entrapment is not an issue. See United States v. Duran, 596 F.3d 1283, 1299 (11th Cir. 2010) ("[B]ecause similar acts used to demonstrate predisposition are offered precisely to show propensity, they are more broadly applicable, and their use is not subject to the normal constraints of evidence admitted pursuant to Rule 404(b)."); United States v. Van Horn, 277 F.3d 48, 57 (1st Cir. 2002) ("[I]n situations where the defendant employs entrapment as a defense to criminal liability, prior bad acts relevant to a

defendant's predisposition to commit a crime are highly probative and can overcome the Rule 404(b) bar."); cf. Sorrells v. United States, 287 U.S. 435, 451 (1932) ("[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense."). With these principles in mind, we turn now to the specific claims raised on appeal.

B.

Lowery argues that the district court erred by permitting the government to introduce evidence establishing that he possessed a firearm on July 28, 2010, some eight months before his involvement in the stash-house sting. Lowery's possession of a firearm on July 28, 2010, was the subject of Count 6 of the indictment in this case, the count severed by the district court prior to trial. When granting Lowery's motion to sever, the court concluded that there was no logical relationship between the firearm count and the conspiracy counts, thus making joinder improper.

At trial, Lowery suggested through his cross-examination of Agent Stallo that Lowery's statement in the March 25, 2011, meeting that he was "strapped" was "bravado" or "just talk," J.A. 246-47, and that no evidence suggested that he actually

19

possessed a gun at such meeting. The government subsequently argued that such questioning opened the door to evidence of Lowery's July 28 possession of a firearm. In overruling Lowery's objection to admitting the evidence, the district court reasoned:

> In light of the inchoate nature of this offense and importance as to the defendant's intent, whether he was engaging in talk with the undercover officer . . . and/or whether he intended to, and had the ability to bring the kind of tools necessary to conduct a robbery that was being discussed. I think it's relevant. It's necessary.

J.A. 522. The district court therefore permitted the government to establish Lowery's possession of the firearm through the testimony of Lowery's former girlfriend, who saw him in possession of the "distinctive" and "unusual" gun on the relevant date, J.A. 554, and the testimony of a police officer who conducted a traffic stop on July 28, 2010, and found the gun when searching Lowery's car.

We see no error in the district court's ruling. In support of his entrapment defense, Lowery argued that he lacked both the predisposition to commit such a robbery and the intent to actually carry it out. Evidence tending to prove that Lowery had the ability to bring a necessary tool, such as a firearm, to conduct the proposed stash-house robbery was relevant to the question of Lowery's predisposition to commit the robbery, and Lowery's prior possession of a firearm showed his familiarity

20

with and access to weapons. Moreover, the firearm that Lowery possessed was a semi-automatic handgun with "two air ports on top of the slide," J.A. 554, and was distinctive enough to be described as "unusual" by a police officer with twelve years of law enforcement experience and eight years of military experience. Given Lowery's recorded statements that the planned robbery called for the powerful weapons that could "chop ligaments," J.A. 177, Lowery's possession of such a distinctive weapon makes it more likely that he had the ability to provide the kind of weapon that he believed would be necessary for the task, and that he would be willing to use it.

Possession of a firearm, of course, is not the same crime as armed robbery. To be admissible under Rule 404(b) to prove predisposition, however, the past conduct need not be identical to the crime charged. Rather, the conduct need only be "similar enough and close enough in time to be relevant to the matter at issue." United States v. Lewis, 641 F.3d 773, 783 (7th Cir. 2011); see also United States v. Brand, 467 F.3d 179, 200 (2d Cir. 2006) ("Predisposition evidence can be established by evidence of a defendant's past conduct; this past conduct should be near enough in kind to support an inference that his purpose included offenses of the sort charged; although it is not necessary that the past conduct be precisely the same as that for which the defendant is being prosecuted." (internal

21

quotation marks omitted)). We believe the bad act at issue here is similar enough to establish predisposition because it involved Lowery's knowing possession of a firearm, as the success of the planned robbery depended on Lowery and McLaurin being willing to sufficiently arm themselves. See Lewis, 641 F.3d at 783 (evidence of 1995 felon-in-possession conviction properly admitted to prove predisposition to commit armed robbery of purported stash house in 2007); cf. United States v. Acosta, 67 F.3d 334, 339 (1st Cir. 1995) (in case where defendant was charged with possession of a weapon by a felon, evidence of prior drug-dealing by the defendant was relevant to the question of predisposition). There is no doubt that the first-person testimony was reliable, and it was also necessary, given that the government bears the burden of proving predisposition. See Queen, 132 F.3d at 997 (explaining that evidence is "necessary" for purposes of Rule 404(b) if the evidence "is probative of an essential claim or element of the offense"). And while the evidence may have been damaging to Lowery's case, it was not unfairly prejudicial. See United States v. Lentz, 524 F.3d 501, 525 (4th Cir. 2008). Under these circumstances, we cannot say that the district court abused its discretion by admitting the challenged evidence. See id. ("Where the evidence is probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should

22

be excluded only sparingly." (internal quotation marks omitted)); United States v. Weaver, 282 F.3d 302, 313 (4th Cir. 2002) ("A district court will not be found to have abused its discretion unless its decision to admit evidence under Rule 404(b) was arbitrary and irrational.").

Moreover, even if the evidence were prohibited by Rule 404(b), the district court acted within its discretion by concluding that Lowery opened the door to its admission. See, e.g., United States v. Catano, 65 F.3d 219, 226 (1st Cir. 1995) ("A district court may allow testimony on redirect which clarifies an issue which the defense opened up on cross-examination even when this evidence is otherwise inadmissible."). When Lowery suggested in his cross-examination of Agent Stallo that Lowery's assertion that he was carrying a gun at the March 25 meeting was "just talk," J.A. 247, and that no evidence suggested that he actually possessed a gun at that meeting, the district court did not err in permitting the government to introduce the evidence of his prior possession of a firearm. Lowery's then-recent possession of a distinctive handgun makes it less likely that his claim of carrying a gun at the meeting and his talk of weapons that could chop ligaments was mere bravado. Accordingly, we find no error in the district court's admission of evidence of Lowery's prior possession of a firearm.

23

C.

McLaurin contends the district court violated Rule 404(b) by admitting a judgment and commitment order establishing that he had been convicted of common law robbery in 2003.

The district court initially excluded all of the government's proposed 404(b) evidence against McLaurin. The court revisited its ruling, however, after the following exchange during McLaurin's cross-examination of Agent Stallo:

Q [McLaurin's Counsel]. During that meeting you also testified that -- something to the effect that Mr. McLaurin indicated to you that he had committed a robbery of a drug dealer in the past?

A [Agent Stallo]. Yes.

Q. With respect to that particular robbery of the drug dealer, do you have any information that Mr. McLaurin actually engaged in that type of conduct?

A. I mean his -- his verbal admission would be the only thing.

Q. I understand that. So you indicated -- you testified that Mr. McLaurin gave you that information. However, do you have any proof -- with respect to that particular crime -- any proof that Mr. McLaurin committed that crime?

A. No, ma'am.

J.A. 254-55. The government argued that this line of questioning left the jury with the misimpression that there was no proof that McLaurin had previously committed a robbery. Counsel for McLaurin, however, argued that she had carefully limited her questions to whether Stallo had proof that McLaurin

24

had previously robbed <u>drug dealers</u>, which she contended did not open the door to evidence of a common-law robbery that did not involve drug dealers.

After reviewing the transcript of the questioning, the district court agreed with the government's position:

> It does appear to the Court that that questioning does alter the 404(b) analysis, making the excluded evidence more relevant by establishing a greater connection to the instant offense. The line of questioning concerning "any information," "any proof," I believe left the jury with the misimpression that there wasn't any proof, not just that the proof had been excluded.
>
> I don't think counsel's attempt to narrow the question just to the robbery of a drug dealer was sufficient to not leave that impression.
>
> I think the jury as a result of the questioning is left with the belief that there is no proof. I don't believe the defendant should get the benefit of excluded proof, and then be allowed to convey to the jury that there is no proof.

J.A. 399. The district court therefore concluded that the cross-examination "opened the door to the 404(b) evidence previously excluded," J.A. 399-400, and the court permitted the government to introduce evidence of McLaurin's 2003 robbery conviction.

We again find no error in the district court's ruling. While McLaurin presses on appeal his view that his questions were limited to whether there was proof that McLaurin had previously robbed drug dealers, we are not convinced that the jury could be expected to draw such a fine distinction. Counsel

25

asked about robbing drug dealers, but she also asked if there was evidence that McLaurin had engaged in "that type of conduct," J.A. 254 (emphasis added), language the jury may well have understood as a broader reference to robberies in general. The district court was in the best position to determine the effect of this line of questioning, see United States v. Blake, 571 F.3d 331, 348 (4th Cir. 2009) (whether questioning opened the door to previously excluded evidence was a matter within the district court's discretion), and we cannot conclude that the court abused its discretion by concluding that McLaurin opened the door to the introduction of the challenged evidence. See United States v. Canniff, 521 F.2d 565, 570 (2d Cir. 1975) ("Despite the distinction between a conviction and a youthful offender adjudication, it would be unfair to the government to permit a defendant who had been adjudicated a youthful offender to create the erroneous impression that he was lily-white by implying to the jury, which cannot be expected to draw such fine distinctions, that he had never committed any offense at all.").

IV.

In a pretrial motion, McLaurin sought to sever his felon-in-possession counts from his conspiracy counts on the ground that such counts were improperly joined under Federal Rule of Criminal Procedure 8. Alternatively, McLaurin sought severance under Federal Rule of Criminal Procedure 14. The district court

26

denied the motion pretrial and again when McLaurin renewed it at the close of the government's evidence. On appeal, McLaurin contends the district court erred by denying his misjoinder motion under Rule 8 and his severance motion under Rule 14. McLaurin contends that the misjoinder of the counts prejudiced him because the felon-in-possession evidence would not have been admissible at a separate trial on the conspiracy counts, and he therefore asks us to vacate his conspiracy convictions and remand for retrial on the conspiracy counts alone.

Rule 8 of the Federal Rules of Criminal Procedure authorizes the joinder of multiple counts against a defendant "if the offenses charged . . . are [(1)] of the same or similar character, or [(2)] are based on the same act or transaction, or [(3)] are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). We interpret the second and third alternative prongs of this rule "flexibly, requiring that the joined offenses have a logical relationship to one another." United States v. Cardwell, 433 F.3d 378, 385 (4th Cir. 2005) (internal quotation marks omitted). Joined offenses have a logical relationship to one another for Rule 8(a) purposes, "when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." Id.

27

"We review de novo the district court's refusal to grant defendants' misjoinder motion to determine if the initial joinder of offenses . . . was proper." United States v. Mackins, 315 F.3d 399, 412 (4th Cir. 2003). "If the initial joinder was not proper, however, we review this nonconstitutional error for harmlessness, and reverse unless the misjoinder resulted in no actual prejudice to the defendants. . . ." Id. (internal quotation marks and emphasis omitted).

We find no reversible error in the district court's determination that the offenses were properly joined.[2] We agree with the government that the conspiracy offenses and felon-in-possession offenses are logically related. The same confidential informant who introduced McLaurin to the undercover officer who purchased the firearms also introduced McLaurin to the Undercover Officers involved in the stash-house sting. The evidence of the felon-in-possession counts establishes with temporal congruity that McLaurin stood at the ready to consider

---

[2] The district court's analysis in its pre-trial denial of the misjoinder motion did rest in part on a faulty factual premise -- the district court believed that the confidential informant who introduced McLaurin to the undercover officers first proposed the stash-house robbery to McLaurin during the firearm sale on February 25. As the trial evidence established, however, the confidential informant was not present for the February 25 transaction, and there was no conversation about the stash-house robbery that day. This error provides no basis for reversal, however, given our independent conclusion that the counts were properly joined.

meeting about a criminal opportunity with anyone whom the confidential informant suggested could provide him with such opportunity. From the fact that McLaurin had experienced two successful criminal transactions -- the gun sales -- that were directly attributable to the same confidential informant's introduction, the jury could reasonably infer that McLaurin had a higher level of trust in the Undercover Officers than he would have had absent his history of prior successful outcomes with criminal opportunities sent his way by the confidential informant.

Moreover, the jury heard through the testimony of Agent Stallo and the recorded meetings McLaurin's statements that he would need a gun for the robbery and that he had recently sold his gun, which further establishes the logical relationship between the charges. In short, McLaurin's felon-in-possession counts have a logical relationship to his conspiracy counts in that they help paint the complete picture of McLaurin's criminal enterprise.

Even if we were to conclude that the counts were improperly joined, we still would not reverse, because the misjoinder caused no "actual prejudice" to McLaurin. Mackins, 315 F.3d at 412. As discussed above, the assertion of an entrapment defense obligates the government to prove the defendant's predisposition, and proving predisposition is one of the "other

29

purposes" for which evidence of the defendant's prior bad acts may be admitted under Rule 404(b). In our view, the evidence of McLaurin's two firearm sales would have been admissible under Rule 404(b) in a separate trial of the conspiracy charges, and McLaurin therefore suffered no actual prejudice from any error. See United States v. Lane, 474 U.S. 438, 450 (1986) (any error in joinder of offenses and defendants was harmless where the evidence of the improperly joined counts likely would have been admissible under Rule 404(b) in a separate trial).

The evidence underlying McLaurin's felon-in-possession charges would be admissible under Rule 404(b) for largely the same reasons that Lowery's prior possession of a firearm was admissible. McLaurin raised an entrapment defense, thus requiring the government to prove his predisposition. The evidence that McLaurin, just weeks before he joined in the robbery plan, sold two weapons to (undercover) Officer Ortiz tends to show that McLaurin was familiar with firearms and had the ability to obtain the weapons necessary to carry out the planned robbery.

Moreover, one of the weapons McLaurin sold to Officer Ortiz was a sawed-off shotgun that McLaurin had hidden in his pants leg. McLaurin showed Ortiz how to operate the shotgun and told him that he could get a magazine for the gun at Wal-Mart, and Ortiz testified that McLaurin seemed "comfortable" with the

30

weapon.  J.A. 477.  As courts have recognized, sawed-off shotguns are "inherently dangerous and generally lacking usefulness, except for violent and criminal purposes."  United States v. Fortes, 141 F.3d 1, 6 (1st Cir. 1998) (internal quotation marks omitted); accord United States v. Mobley, 687 F.3d 625, 631 (4th Cir. 2012) (sawed-off shotguns have no lawful purpose), cert. denied, 133 S. Ct. 888 (2013); United States v. Allegree, 175 F.3d 648, 651 (8th Cir. 1999) (same); cf. District of Columbia v. Heller, 554 U.S. 570, 625 (2008) ("[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").  In our view, McLaurin's possession of and familiarity with an inherently dangerous weapon useful only for violent, criminal purposes is highly probative of McLaurin's predisposition to engage in a very dangerous armed robbery.  See Lewis, 641 F.3d at 783 (evidence of felon-in-possession conviction properly admitted to prove predisposition to commit armed robbery of purported stash house).

Accordingly, we conclude that, in a separate trial on the conspiracy charges, Rule 404(b) would have permitted the introduction of the evidence underlying McLaurin's felon-in-possession charges.  McLaurin thus suffered no actual prejudice from the joinder of the counts, and any error in their joinder

31

is harmless. See Lane, 474 U.S. at 450; Mackins, 315 F.3d at 412.

Our conclusion in this regard also forecloses McLaurin's contention that the district court erred in denying his Rule 14 motion to sever the felon-in-possession counts. See Fed. R. Crim. P. 14(a) ("If the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires."). Even if we were to assume that the district court abused its discretion by denying McLaurin's severance motion, see United States v. Dinkins, 691 F.3d 358, 367 (4th Cir. 2012) (stating standard of review), cert. denied, 133 S. Ct. 1278 (2013), the error did not prejudice McLaurin, and reversal is not required, see United States v. Acker, 52 F.3d 509, 514 (4th Cir. 1995) (reversal under Rule 14 is required only if the defendant shows that requiring him to defend against the joined offenses in the same trial resulted in "clear prejudice"). We therefore reject McLaurin's challenges to the joinder of the felon-in-possession charges with the conspiracy charges.

Contrary to McLaurin's arguments, this court's decision in United States v. Hawkins, 589 F.3d 694 (4th Cir. 2009), does not compel us to conclude otherwise. In Hawkins, we held that the district court erred by denying the defendant's motion to sever

32

a felon-in-possession charge from an unrelated carjacking charge, concluding that the offenses were not of the "same or similar character" under Rule 8(a). See id. at 704. As we explained, "[w]hile the offenses all involved firearms, albeit different firearms, nothing ties them together except the defendant. There are no additional factors which indicate the offenses were 'identical or strikingly similar.'" Id. We concluded that the joinder error was not harmless because the evidence supporting the felon-in-possession charge "would have been only marginally relevant, if relevant at all," to the remaining charges and therefore would not have been admissible had separate trials been conducted. Id. at 705.

As noted above, Rule 8(a) provides multiple bases for the joinder of charges against a single defendant. The Hawkins court's conclusion that, based on the facts of that case, the joined charges were not "of the same or similar character," Fed. R. Crim. P. 8(a), does not preclude us from concluding, on different facts, that the charges joined in this case have a logical relationship and thus "are connected with or constitute parts of a common scheme or plan," id. Likewise, that the error in Hawkins was not harmless does not prevent us from concluding otherwise in this case. Because the defendant in Hawkins did not assert an entrapment defense, his predisposition was not at issue. As previously discussed, the assertion of an entrapment

33

defense renders a wider range of bad-act evidence admissible under Rule 404(b) than might otherwise be the case.

V.

Finally, we turn to McLaurin's challenge to his sentence. McLaurin argues that the district court erred by accepting the PSR's calculation of his criminal history category. Specifically, McLaurin contends the PSR erroneously assessed a total of three criminal history points for two 2003 common law robbery convictions, because McLaurin committed such robberies at age sixteen. McLaurin contends the error increased his sentencing range under the United States Sentencing Guidelines from 121 to 151 months' imprisonment to 151 to 188 months' imprisonment. McLaurin admits that he did not object to the PSR's calculation of his criminal history category below, and therefore, we review only for plain error. See Fed. R. Crim. P. 52(b).

To obtain relief under plain-error review, McLaurin must first establish that "the district court erred, that the error was plain, and that it affected his substantial rights. Even when this burden is met, we have discretion whether to recognize the error, and should not do so unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Aidoo, 670 F.3d 600, 611 (4th Cir. 2012) (citation and internal quotation marks omitted).

34

In the sentencing context, the third prong of the plain-error standard is satisfied if there is "a non-speculative basis in the record to conclude that the district court would have imposed a lower sentence upon the defendant but for the error." United States v. Knight, 606 F.3d 171, 180 (4th Cir. 2010).

The government concedes that there was error in the calculation of McLaurin's criminal history that increased McLaurin's advisory sentencing range, and it does not dispute that the error was plain. As to the third prong, the transcript of the sentencing hearing provides a non-speculative basis for us to conclude that the district court would have given McLaurin a lower sentence than 151 months' imprisonment had it known that McLaurin's correctly calculated sentencing range under the advisory Guidelines was 121 to 151 months' imprisonment. The district court, through several comments at sentencing, made it clear that it was very troubled by the 151-188 month Guidelines range, in that the sentencing range was driven by the fictitious weight of the fictitious drugs contained in the fictitious stash house. These concerns, when considered along with the district court's decision to sentence McLaurin at the low end of the Guideline range it believed to be applicable, provide a non-speculative basis for concluding that the district court would have imposed a sentence of less than 151 months had the Guidelines range been properly calculated. And because we

35

believe that allowing this error to stand would seriously affect the fairness, integrity or public reputation of judicial proceedings, we exercise our discretion to correct the plain error in calculating McLaurin's Guidelines' range by vacating his sentence and remanding for resentencing.

VI.

Accordingly, for the foregoing reasons, we hereby affirm the convictions of McLaurin and Lowery, but we vacate McLaurin's sentence and remand for resentencing consistent with this opinion.

No. 13-4138 <u>AFFIRMED IN PART, VACATED IN PART, AND REMANDED</u>

No. 13-4139 <u>AFFIRMED</u>

FLOYD, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's opinion except as to Part IV, in which it concludes that the district court did not err in joining McLaurin's felon-in-possession counts with his conspiracy counts. Federal Rule of Criminal Procedure 8(a) allows "very broad joinder" such that "joinder is the rule rather than the exception." United States v. Hawkins, 589 F.3d 694, 700 (4th Cir. 2009) (quoting United States v. Mackins, 315 F.3d 399, 412 (4th Cir. 2003); United States v. Armstrong, 621 F.2d 951, 954 (9th Cir. 1980)) (internal quotation marks omitted). "Broad," however, does not mean "unlimited." Because I believe that the district court overstepped Rule 8(a)'s boundaries, I respectfully dissent.

I.

Pursuant to Rule 8(a), joinder of offenses is appropriate when the offenses are (1) "of the same or similar character," (2) "based on the same act or transaction," or (3) "connected with or constitute parts of a common scheme or plan." This Court has interpreted Rule 8(a)'s second and third prongs to allow joinder when "the joined offenses have a 'logical relationship' to one another," meaning that "consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise." United States

v. Cardwell, 433 F.3d 378, 385 (4th Cir. 2005) (quoting United States v. Hirschfeld, 964 F.2d 318, 323 (4th Cir. 1992)). This Court reviews de novo the question of whether charges were properly joined. Hawkins, 589 F.3d at 700.

The government contends that joinder was proper because McLaurin's felon-in-possession and conspiracy counts were "based on the same act or transaction" and were "connected with or constitute[d] parts of a common scheme or plan." In support of this argument, the government points out that the confidential informant who introduced McLaurin to the undercover agent for the purpose of the firearms sales underlying the felon-in-possession charges also introduced him to Special Agent Shawn Stallo, the undercover agent who proposed the stash house robbery. The government also avers that "law enforcement identified McLaurin as a target for the home invasion investigation, at least in part, as a result of McLaurin's two firearms sales to the undercover officer." In sum, the government argues that "[b]ecause the story of McLaurin's role in the home invasion investigation begins with the two firearms sales, the district court correctly concluded that the felon-in-possession counts were logically related to the conspiracy counts."

The government made a similar argument that two charges were logically related because they stemmed from a single law

38

enforcement investigation in United States v. Cardwell. In that case, this Court considered whether the lower court erred in joining a felon-in-possession count with counts related to an attempted murder for hire. Law enforcement officials found the firearm that was the basis for the felon-in-possession charge when they arrested the defendant for the planned murder. 433 F.3d at 383-84. The government contended that the counts were logically related because "the firearm count was based on the seizure of the [gun] during the investigation of the murder-for-hire-scheme." Id. at 386 (alteration in original) (internal quotation marks omitted). The Court rejected the government's argument and concluded that the discovery of the gun during the murder-for-hire investigation established only a temporal link between the felon-in-possession and murder-for-hire counts, which was insufficient to create a logical relationship between the crimes. Id. ("A contrary holding would effectively read Rule 8(a) to allow limitless joinder whenever the charge resulted from the fruits of a single investigation."). However, the Court ultimately found that the district court had properly joined the counts due to "additional facts." Id. at 387 (emphasis omitted). Specifically, after officers arrested the defendant for the attempted murder, he stated that he would have used the gun to shoot them if he had known they were about to arrest him. Id. at 384, 387.

Cardwell establishes that a relationship between the law enforcement investigations into two crimes does not render those crimes logically related under Rule 8(a). The government's contention that law enforcement officials identified McLaurin as a target for a home-invasion investigation due to the firearm sales is therefore beside the point. Accordingly, the only remaining link between the felon-in-possession counts and the conspiracy counts is their temporal proximity, and, as I note above, Cardwell makes it clear that a temporal link between charges does not make joinder appropriate unless "additional facts" counsel otherwise. See also Hawkins, 589 F.3d at 704 ("[A] mere temporal connection is not sufficient to establish the propriety of joinder.").

The majority brings up two additional considerations in support of its conclusion that McLaurin's felon-in-possession charges are logically related to his conspiracy charges. First, the majority contends that "[f]rom the fact that McLaurin had experienced two successful criminal transactions—the gun sales— that were directly attributable to the same confidential informant's introduction, the jury could reasonably infer that McLaurin had a higher level of trust in the Undercover Officers than he would have had" otherwise. Ante at 28-29. However, I cannot discern how this potentiality renders the felon-in-possession and conspiracy counts logically related. Although

40

McLaurin's increased trust may have allowed law enforcement officials to succeed in getting him to participate in the home-invasion scheme, this consideration speaks only to the connection between the law enforcement investigations into the felon-in-possession and conspiracy counts. <u>Cardwell</u> therefore renders this point irrelevant to the Rule 8(a) calculus.

Second, the majority points out that McLaurin told Special Agent Stallo that he needed a new firearm to use during the home invasion, presumably because he sold his only guns during the controlled buys that resulted in the felon-in-possession charges. <u>Ante</u> at 29. If anything, this fact renders the conspiracy and felon-in-possession counts <u>less</u> related because the firearms sales prevented McLaurin from using those weapons in furtherance of the home invasion. Because these additional considerations do not draw a logical connection between the conspiracy and felon-in-possession counts, I would hold that the district court should not have joined them.

## II.

The fact that the district court erred in joining McLaurin's felon-in-possession and conspiracy counts does not end the inquiry. Misjoinder warrants reversal only if it "affects substantial rights," meaning it "result[ed] in actual prejudice because it had substantial and injurious effect or

influence in determining the jury's verdict." Hawkins, 589 F.3d at 704 (quoting United States v. Lane, 474 U.S. 438, 449 (1986)) (internal quotation marks omitted). To determine whether misjoinder resulted in actual prejudice, this Court considers the following indicia of harmlessness:

> (1) whether the evidence of guilt was overwhelming and the concomitant effect of any improperly admitted evidence on the jury's verdict; (2) the steps taken to mitigate the effects of the error; and (3) the extent to which the improperly admitted evidence as to the misjoined counts would have been admissible at trial on the other counts.

Id. at 700, 704 (quoting Mackins, 315 F.3d at 414). The government will prevail if it proves that each of these elements weigh in favor of harmlessness. Id. at 700.

Under this Court's precedent, a district court may give an entrapment instruction only if "there is sufficient evidence from which a reasonable jury could find entrapment." United States v. Hsu, 364 F.3d 192, 198-99 (4th Cir. 2004) (quoting Mathews v. United States, 485 U.S. 58, 62 (1988)) (internal quotation marks omitted). The district court held as a matter of law that this case warranted an entrapment instruction, and the government does not challenge that determination on appeal. I therefore conclude that the evidence of McLaurin's guilt on the conspiracy counts was not overwhelming.

In addition to inquiring whether the evidence of guilt was overwhelming, the first harmlessness factor also asks whether

42

the evidence had an effect on the jury's verdict. McLaurin contends that joinder affected the verdict because the government used the facts of the February 25 gun possession to argue against entrapment. Specifically, during its closing argument, the government made the following statement:

> [Defense counsel] told you in his closing that this should be concerning to you, that government agents go out and just make up crimes. No, what should be concerning to you is if government agents, law enforcement sat back and waited for crime to happen.
> What should be concerning to you is that members of the general public are walking around with sawed off shotguns shoved down their pants leg, selling them to undercover police officers. That should concern you.

In other words, the government drew a connection between McLaurin's predisposition to commit the home invasion and one of his felon-in-possession charges. The government does not attempt to argue that this portion of its closing argument had no effect on the jury's verdict. Instead, as I discuss in greater detail below, the government contends that the evidence underlying the felon-in-possession charges would have been admissible to prove McLaurin's predisposition even if the district court had declined to join the offenses.

Turning to the second harmlessness factor, the district court attempted to mitigate the effects of joining McLaurin's felon-in-possession and conspiracy counts by giving the following limiting instruction:

43

> Each count and the evidence pertaining to it should be considered separately. The case of each defendant should be considered separately and individually.
>
> The fact that you may find one or both of the accused guilty or not guilty of any of the crimes charged, should not control your verdict as to any other crime or other defendant.

This Court presumes that juries follow courts' instructions. See United States v. Chong Lam, 677 F.3d 190, 204 (4th Cir. 2012). This indicator of harmlessness therefore weighs against a finding of prejudice.

The government's argument that misjoinder did not prejudice McLaurin relies heavily on the third harmlessness factor: the extent to which the evidence regarding the felon-in-possession charges would have been admissible at a separate trial on the conspiracy charges. According to the government, Federal Rule of Evidence 404(b) would allow admission of the facts underlying the felon-in-possession charges because they speak to McLaurin's predisposition to commit the stash house robbery. Specifically, the government argues that the evidence "shows that McLaurin had access to the tools required to complete the robbery" and therefore serves to "rebut his entrapment defense" by demonstrating his ability and intent to follow through with the home invasion.

When a defendant raises an entrapment defense, the government may demonstrate predisposition through evidence that

44

the defendant committed similar crimes in the past. See United States v. Tanner, 61 F.3d 231, 238 (4th Cir. 1995) ("[The defendant] demonstrated his predisposition to [distribute a drug] over and over again, through his pattern of illegal sales of various drugs over many years."); see also United States v. Abulhawa, 833 F.2d 1006 (4th Cir. 1987) (unpublished table decision) ("It is clear that the government is permitted broad latitude under Rule 404(b) to introduce evidence of relevant prior acts once a defendant has raised a claim of entrapment thereby putting into issue his predisposition to commit the crimes with which he is charged."). As the Second Circuit explained, "this past conduct should be 'near enough in kind to support an inference that his purpose included offenses of the sort charged;' although it is not necessary that the past conduct be precisely the same as that for which the defendant is being prosecuted." United States v. Brand, 467 F.3d 179, 200 (2d Cir. 2006) (quoting United States v. Harvey, 991 F.2d 981, 994 (2d Cir. 1993)). The key inquiry in these cases, therefore, is whether the defendant's past conduct is similar enough to the charged crime to render the evidence probative of predisposition.

Both the majority and the government cite numerous cases from our sister circuits that illustrate the degree of similarity required to render past conduct indicative of

45

predisposition to commit the charged crime. For example, in United States v. Cervantes, 706 F.3d 603, 616 (5th Cir. 2013), the Fifth Circuit concluded that the defendant's prior participation in an attempted home invasion was similar enough to the charged conspiracy to commit an armed home invasion to weigh on his predisposition. Other courts have viewed only comparably similar prior acts as probative of the defendant's predisposition in entrapment cases. See United States v. Brannan, 562 F.3d 1300, 1307-08 (11th Cir. 2009) (evidence that defendant had engaged in sexual acts at a wildlife refuge sufficiently similar to charged offenses of indecent exposure and public lewdness at the same wildlife refuge); United States v. Abumayyaleh, 530 F.3d 641, 650 (8th Cir. 2008) (convictions for receiving a stolen firearm and being a felon in possession of a firearm sufficiently similar to charge for being a felon in possession of a firearm); Brand, 467 F.3d at 199-200 (evidence that the defendant possessed child pornography and child erotica sufficiently similar to charged crimes related to sexual acts with children); United States v. Van Horn, 277 F.3d 48, 57-58 (1st Cir. 2002) (prior burglary of an explosives depot sufficiently similar to charged possession of explosives); United States v. Goodapple, 958 F.2d 1402, 1406-07 (7th Cir. 1992) (evidence that the defendant had engaged in drug transactions sufficiently similar to charged distribution of and

46

possession with intent to distribute controlled substances). The sole outlier is United States v. Acosta, in which the First Circuit concluded, without explanation, that the defendant's seemingly irrelevant prior drug dealing was "properly made known to the jury" during his trial on two felon-in-possession charges. 67 F.3d 334, 339 (1st Cir. 1995) (discussing the merit of the defendant's entrapment defense).

The case that comes closest to allowing evidence of gun possession to demonstrate predisposition to commit an armed crime is United States v. Lewis, 641 F.3d 773 (7th Cir. 2011), which concerned counts stemming from a home-invasion investigation similar to the one at issue in this case. In Lewis, the Seventh Circuit determined that the court below had not erred in admitting evidence of the defendant's prior convictions for (1) being a felon in possession of a firearm and (2) theft involving a home invasion. Id. at 779, 783. The district court allowed the evidence because, together, the two prior convictions showed "a pattern of behavior by someone who has an intent, first, to use a firearm unlawfully, and, secondly, to enter into a residence and commit theft." Id. at 783 (internal quotation marks omitted). Nothing in the Seventh Circuit's opinion indicates that the court would have reached the same conclusion if the lower court had admitted the felon-

in-possession conviction without also admitting the theft conviction.

When I compare the instant case to Lewis and the other entrapment cases that I cite above, I am compelled to draw the conclusion that a felon-in-possession charge is not similar enough to a home-invasion conspiracy to render the former crime indicative of predisposition to commit the latter crime. In a typical case, the only similarity between conspiracy to commit an armed home invasion and possession of a firearm is the fact that both crimes involve firearms. This Court has made it clear that the presence of weapons does not render two crimes similar enough to warrant admitting evidence of one crime at a trial for the other. In United States v. Hawkins, the Court considered whether the misjoinder of a defendant's carjacking and felon-in-possession charges was harmless. 589 F.3d at 704-07. The Court concluded that the firearm possession was "only marginally relevant, if relevant at all," to the carjacking counts in light of the fact that the only thing tying the crimes together was the use of different firearms. Id. at 705. The Court ruled that the felon-in-possession evidence would be inadmissible under Rule 404(b) at a separate trial on the carjacking counts. Id.

I acknowledge that Hawkins did not involve an entrapment defense. However, this distinguishing factor does not alter my

48

conclusion that, like the felon-in-possession evidence at issue in <u>Hawkins</u>, evidence of McLaurin's firearms possession would be inadmissible at a separate trial on his remaining charges.[*] There is a fine line between evidence showing predisposition (which Rule 404(b) allows) and evidence showing criminal propensity (which Rule 404(b) prohibits). The evidence underlying McLaurin's felon-in-possession charges undoubtedly falls into the latter category. It requires quite a logical leap to conclude that a felon is predisposed to conspire to rob a drug stash house simply because he possessed and sold two firearms, even when one of those firearms was a sawed-off shotgun. In my view, Rule 404(b) does not permit such an attenuated connection between a prior bad act and the alleged crime at issue. A contrary finding would veer dangerously close to interpreting Rule 404(b) in a way that gives the government unlimited power to use evidence of prior crimes whenever a

---

[*] I would not reach the same conclusion under an abuse-of-discretion standard of review. Although I believe that the law does not support admitting evidence of McLaurin's firearms possession to prove his predisposition to commit the home invasion, concluding that it does so is not arbitrary or irrational. <u>See</u> <u>United States v. Moore</u>, 27 F.3d 969, 974 (4th Cir. 1994) (explaining that a district court abuses its discretion only when it acts "arbitrarily or irrationally"). For this reason, I join Part III.B of the majority's opinion, which concludes that the district court did not abuse its discretion by admitting evidence of Lowery's firearm possession pursuant to Rule 404(b).

49

defendant raises an entrapment defense.  See, e.g., Acosta, 67 F.3d at 339 (reaching the questionable conclusion that evidence of the defendant's drug dealing spoke to his propensity to possess firearms because "drug dealing is often associated with access to weapons").  This is precisely the type of trial-by-character that Rule 404(b) aims to prevent.

## III.

I would hold that district court erred in joining McLaurin's conspiracy charges with his felon-in-possession charges.  Because this error was not harmless, I would vacate McLaurin's conviction on the conspiracy counts and remand for retrial.